All right, our next case is Phelps v. Noble Energy, case number 24-1005. Counsel, you may proceed. Thank you, Your Honor. I am George Barton. I'm arguing on behalf of Phelps Oil and Gas, to which I refer to simply in this argument as Phelps. There's two issues in this appeal. One related to what's referred to in the briefing as the 100% obligation portion of the applicable future royalty calculation method. The second issue is related to the 50% obligation portion. I first want to address the 100% obligation claim, and specifically Phelps' contention that the district court erred in denying, well, in granting Noble Energy's motion for summary judgment on Phelps' claim that it was entitled to its royalty share of DCP Midstream's $17.5 million consideration that it paid to, which was the principal part of its consideration that it paid to settle Noble Energy's $34 million price deficiency claim against DCP. And really, in essence, this issue goes back to, it really was fully addressed in summary judgment briefing that was submitted by both Noble and Phelps in March of 2016 and May of 2016. So in the March 2016 summary judgment motion that Noble filed, Noble argued that Phelps was not entitled to any share of DCP's $17.5 million settlement consideration. And Phelps, on the other hand, argued that it was entitled to summary judgment on that claim, because Phelps argued that its entitlement was consistent with this court's decision in Watts and the Colorado Court of Appeals' decision in Westbrook, as well. So initially, when Judge Blackburn, District Judge Robert Blackburn, ruled on this on September 26, 2017, he determined that Phelps was actually entitled to summary judgment on the issue that it did have an appropriate royalty share, or may have an appropriate royalty share, on the $17.5 million consideration that DCP paid to settle Noble's $34 million claim. And so he did, but he didn't grant summary judgment in favor of Phelps, but he denied Noble's summary judgment motion. And so subsequently, though, in an order that Judge Blackburn entered a year later, in September of 2018, Judge Blackburn determined that Phelps was required to prove something additionally, and that Phelps had to prove that the $17.5 million consideration that DCP agreed to pay as part of that March 2010 settlement. You keep saying agreed to pay, agreed to pay, but the agreement wasn't to pay Noble, it was to invest in capital improvements to its own operations. Isn't that what the settlement was? Yes, that was the settlement consideration. So there was no payment to Noble. No. The $17.5 wasn't paid to Noble. That's correct, Your Honor. And to the extent the $17.5 is going to generate additional revenues that go to Noble, Noble will have to pay on that, correct? Yes. Okay. But as far as the $17.5, that never went to Noble. And what Judge Blackburn said is that Phelps needed to show that Noble received value independent of increased production and revenue. And he says that's consistent with Watts. So are you saying that Judge Blackburn was wrong to say that? Yes. All right. Tell us why. Because Watts holds that the lessor is entitled to receive its share of whatever settlement consideration is paid by the settling purchaser to resolve the gas producer's claim against the settling purchaser. And it extends to any form of consideration that's paid by DCP in this case to resolve the $34 million price deficiency claim that was asserted by Noble against DCP. Well, Counselor, if your theory is correct, that Phelps was entitled to some payment from that consideration for infrastructure upgrades, but which my understanding is Phelps also benefits because that leads to increased production, thereby increased royalties. So if your theory is correct, why is Noble's argument that that's essentially double dipping into royalties? Why is that wrong? Well, I think it's wrong, Your Honor, because it's really, I mean, the consideration that gets paid is we're going to, you know, own infrastructure and pay $17.5 million. And part of the agreement was... No, but they're spending. But they're not paying it to Noble. And so there's no trickle down there that would go to the royalty owners. So I think Judge Mathis is saying you keep saying it was paid, but it was spent. So it's a little bit different, isn't it? Well, it was part of the settlement consideration. And it was an express part of the settlement consideration. And both parties agreed that that settlement consideration was for the primary benefit of Noble. So that was part of the settlement consideration that DCP agreed to pay Noble to resolve the $34 million pricing claim. And if you look at the decision in Watts, Your Honor, it says, you know, that the royalty owner is entitled to its royalty share of the $34 million price deficiency claim. And it's very, very extensive in the way that the Watts decision addresses it. It says lessors are entitled to a royalty on the fair market value of the consideration paid by the settling gas purchaser. That was part of the fair market value of what DCP paid to Noble to resolve the $34 million price deficiency claim. Well, but the problem you have is that these were proceeds of the settlement, as in Watts. But these proceeds are clearly not royalty bearing, at least until after this investment is made and you see the increased royalties, at which point Phelps will get its share. So, I mean, this all makes sense if the consideration here of the $17.8 million or $17.5 million was royalty bearing, but it clearly isn't at this point. Well, I think if you look at the Watts decision, and this is really what this Court was looking at in Watts, you know, they really addressed those issues, Judge Moritz. They said the gas producer cannot escape the duty to pay royalties merely by disguising the form of consideration received in the settlement of pricing disputes, and this is a direct quote from the Watts decision, this is true irrespective of the collateral benefits the items of consideration have conferred upon lessors. That emphasizes the extent to which this Court was emphasizing that whatever the form of consideration is, the royalty owners are entitled to their royalty. Let me ask you this. What if instead of an agreement to invest in infrastructure, parties get together and DCP says, I'll tell you what, if we can make this go away, we'll donate $17.5 million to the local food bank as consideration for settling this dispute. Does the 100% rule apply to that? Well, I think, you know, the thing that we're talking about here, Judge Masson, the best way to answer this is, there's a 34 million... Well, what's the answer? Does any consideration, wherever it goes... I think the answer is yes, under the Watts decision, and there's good reason for that. You know, if DCP had been found liable for the $34 million in price deficiencies, then clearly the royalty owners would have been entitled to their royalty share of the $34 million. That was the price deficiency. But here they entered into a settlement agreement where DCP agreed to invest $17.5 million in their own infrastructure, primarily for the benefit of Noble, and that was part of the settlement consideration. They could have paid it in cash to Noble, that's true, but they structured it. So instead they were investing the $17.5 million in their own infrastructure, which had a benefit to Noble. That's part of the settlement consideration. Isn't that what Judge Blackburn said that Phelps needed to show? That the investment in the infrastructure would benefit Noble apart from increased production and revenue. In other words, Judge Blackburn said exactly what you just said, which is, if you can show it's going to benefit Noble, then okay, fine. But apparently that wasn't the case. Did Phelps even try to make a showing that it would benefit Noble? Well, I think we made some arguments to that effect. But certainly the $17.5 million that DCP agreed to invest in its own infrastructure was going to have a benefit to Noble's future gas production and future gas revenue. Fine, prove it, show it, show me that that's the case, and then we can talk about royalties. But isn't that exactly what he asked Phelps to do? That is exactly what he asked Phelps to do, and our position is... Yeah, but when I just quoted or stated Judge Blackburn's holding on this a few minutes ago, you said it was wrong. We think it is wrong. That additional requirement is wrong because that's not... I mean, Phelps should be entitled to a royalty on the entire settlement consideration that was paid. Oh, now it's the whole $17.5 million. Well, that's the settlement consideration. What does the record in district court show in terms of Phelps proving that that had value to Noble? What does the record show on that? I think the record shows that there was a settlement agreement that DCP invested $17.5 million in its own infrastructure, and that DCP agreed to do that to resolve the $34 million price deficiency claim that Noble was asserting against DCP. So that settlement consideration, that's money that DCP paid out to settle the $34 million price deficiency claim. But it didn't pay it out to Noble. It invested that money, and those investments became royalty bearing. And Noble then gets, as does your client, their share of that. So that's the consideration that Noble got, was the right to the future royalties off of that increased production. And the fair market value of that consideration was $17.5 million. Because that's what DCP agreed to pay to settle the price deficiency claim. Counsel, can I ask the same question, perhaps differently? The district court findings, I believe it's summary judgment, were that there was no evidence provided by Phelps. I heard you say a minute ago, well, we made arguments, and I can assume one of those arguments was, well, Watts doesn't require us to present any evidence, because as a matter of law, we're right here. But did Phelps present any evidence? So as we're reviewing the summary judgment order, we can say either there is a genuine issue of fact here for us to send it back down, or there's not. Because Phelps didn't even attempt to present any evidence or counter any facts that were submitted by Noble. Well, I don't think Phelps was able to produce any evidence in honesty, Judge Federico, that there was value to Noble independent of the increased gas production and increased revenues, because that's what the $17.5 million was paid so that DCP's infrastructure could be improved. But, again, our position was, and we argued this at both Judge Blackburn, and we argued it in the 2023 litigation, was that if you look at Watts, all these settlement considerations that were involved, is that the settlement consideration, the royalty owner is entitled to their share of that settlement consideration, irrespective of the collateral benefits of the settlement. And the collateral benefits, the items of consideration have conferred upon lessors, because that's really what your questions are about here. Well, the royalty owners are getting these collateral benefits from the fact that in the future they're going to get increased royalties. That's what Watts rejected. That's why Watts was so significant. And it was adopted again, the Watts approach was adopted by the Colorado Court of Appeals in Western. That the royalty owner's share of it, it extends to any part of the settlement, irrespective of the collateral benefits that the lessors are receiving. And that's a binding decision of this court that was explicitly adopted by the Colorado Court of Appeals in Western. Thank you, counsel. Your time has expired. Good morning. May it please the court. The problem with both of Phelps' arguments is that Phelps has already been paid the royalties it seeks. It has already been paid royalties on the $17.5 million that DCP promised to invest in its own system, and it's already been paid royalties on 50% of the gas that the DCP promised to invest in its own system. And it's already been paid royalties on 50% of the gas that it claims DCP improperly retained. What Phelps actually seeks here is a double recovery of royalties, and the district court correctly determined that nothing in the Holman settlement or in the law entitles it to such a double recovery. I'll start with the $17.5 million promise that was the focus of Mr. Barton's argument. The primary point to understand here, and the panel seems to readily grasp this, is that this was not a payment from DCP to Noble. Instead, it was a promise by DCP to make certain improvements in its gathering and processing system in ways that would benefit Noble through increased future production. One example would be larger capacity pipes that would reduce line pressures and allow Noble and other producers to push more volume through those pipes going forward. So Noble wasn't paid the $17.5 million. So the district court rightfully asked the question then, what benefit did Noble actually obtain? From that settlement consideration. Phelps previously disputed that Noble got some kind of benefit beyond increased future production, but it no longer disputes that now. And Phelps also doesn't dispute that Noble properly paid Phelps and other royalty owners on that increased future production as it was realized. So what is Phelps, what is left of Phelps' claim? Phelps claims that Noble somehow violated the rule of Watts and Westerman, and Noble was not paid the $17.5 million. And that's just not right. The rule of those cases is that you can't cheat royalty owners by settling a pricing claim for non-royalty bearing consideration, and then not pay royalties on the value of that consideration. But that didn't happen here. Noble agrees the $17.5 million was consideration for settlement of a pricing claim, but we paid royalties on it. Again, the only benefit of that $17.5 million- What do you mean you paid royalties on it? Could you explain that point? Certainly. So the district court found, and now it is no longer disputed, that the only benefit Noble obtained from that term of the settlement agreement that DCP promised was increased future production going forward. As those capital projects were built and put online in DCP's gathering and processing system, it enabled Noble to produce more gas from its wells, including wells of royalty owners like Phelps. Okay, I understand. So you're talking about paying royalties in the future, after the settlement? Yes, that's correct. Let me just ask you, though. So the dispute, when the claim was for $34 million in underpayments, and the dispute between Phelps and Noble, I mean, we're talking right now about the $17.5 and the increased production and so forth going forward, but if we look backwards, the dispute was over underpayments in the past, and the settlement of $17.5 million, couldn't it be interpreted as addressing or even conceding that there were underpayments going back, and the $17.5 was to account for the failure to pay in the past? So why wouldn't that give Phelps an argument that at least something in the $17.5 isn't about future royalties, but really compensating them for royalties that they should have received? I mean, that's why there was a dispute in the first place. Correct. What's wrong with that argument? Maybe they haven't made it, I don't know, it just occurred to me. So the $17.5 million promise was really but one piece of the settlement agreement, one component of the consideration that DCP gave to Noble. And your Honor is correct, it was in settlement of Noble's claims for underpayment of $17.5 million. And that was the dispute of past production. But all that does is satisfy the first prerequisite under the Watts and Westerman line of cases that the consideration be given to the producer or the lessee, like Noble, in settlement of a past pricing claim. And we don't contest that. That was the dispute between Noble and DCP that was the subject of the Noble audit. But the second piece of the Watts-Westerman calculus is to determine what the settlement of $17.5 million was. And what the value of that consideration actually was to Noble here. And that comes right out of the Watts case. I'm quoting from the Watts case, the amount that's royalty bearing is, quote, whatever settlement consideration the lessee receives. That's at 115 F3rd at 793. You see similar language in the Westerman case. So that was the exact inquiry that Judge Blackburn undertook. And that would have been a very straightforward inquiry. He determined what is the value of this beyond increased future production, which everybody agrees Noble properly paid royalties on. And he allowed plaintiffs a supplemental period of discovery to try to determine that value. They were not able to come up with anything. They tried to build a case that this was monies that Noble otherwise would have had to pay. But the DCP paid in its stead under the settlement agreement. There was no such evidence of that. And I think I just heard Mr. Barton concede that point. So once that's established that there was no value of this settlement consideration to Noble beyond future production, and it's no longer disputed that Noble properly paid those royalties going forward, there's nothing left of this claim. But aren't they saying that the initial shortfall was $34 million? And but for the settlement agreement, if this had been a cash payment of the $34,000, they would have gotten their cut. And so the fact that Noble decided that instead of taking cash, we'll allow you this promise, and that will be part of the consideration, that then they got cheated out of their share. I mean, isn't that what this is about? If there had been some evidence that Noble accepted that settlement term in lieu of a cash payment, that might be a different situation. But there was no such evidence in the record. This was a good faith settlement, an arm's length settlement, and the best settlement that Noble could negotiate with DCP under the circumstances. And it's important to remember that Noble's and its royalty owners' interests are aligned here. You know, Noble was claiming it had been underpaid from the get-go. That was the purpose of these audits that occur quite regularly between producers and their gatherer processors like DCP. Noble wanted to get as much money as it could because, you know, if we assume 12% royalty burden, it was going to get 88% of the benefit of this settlement. So there was no evidence of collusion here or that this term was in lieu of a cash payment or that this term was in lieu of a cash payment. This term represented monies that Noble otherwise would have had to pay, and the district court correctly granted summary judgment on that claim. I'd like to turn now to the 50% royalty claim that Mr. Barton didn't address just to make sure that we've covered that. Quickly, Phelps contends here, as they did below, that Noble breached Paragraph 6A2 of this Holman Settlement Agreement. But that provision plainly applies only when DCP, quote, returns a percentage of the provider's cash payment. That is, the sale proceeds to Noble. And that just didn't happen with respect to these disputed audit claims. There were no proceeds returned to Noble. An example is the vapor recovery claim or the VRU claim that you've seen in the briefing. Very briefly, the basis of that audit claim was that DCP installed this equipment, these VRU units, on its gathering system, captured vapors that flashed off the liquids in the gathering system, and then DCP kept those for a period of time. That was the basis of the claim. But as you can see from that example, DCP disputed that, and no proceeds were returned to Noble as that gas was produced, and no proceeds were returned to Noble in the settlement of that claim. So Paragraph 6A2 of the Holman Settlement Agreement was just never implicated, and that's what Judge Blackburn correctly held. But there is a provision in the Noble Settlement Agreement, which is 6A4, that ensures that royalty owners like Phelps are paid on the entirety of the gas that comes out of their wells, regardless of whether DCP pays Noble on that. And that's the 50 percent obligation. The Holman Settlement Agreement, in short, requires Noble to pay Phelps and its royalty owners 100 percent on the proceeds, the money it receives from DCP. And 50 percent on the value of the gas for which it is not paid by DCP. And it doesn't matter if DCP uses that gas as fuel, or if it flares it, or vents it, or if, as contended in the audit and by Phelps, it improperly retained volumes for itself that it should not have retained. And the way that Noble does this, again, this was undisputed below, is that it determines a per unit, typically per unit, or per unit. And it determines a per unit, typically per unit, or millions of BTU value for the gas, based on the sales price that DCP returns to it. It applies that to the entirety of the gas stream. And it measures the difference between the volume at well heads for royalty owners like Phelps and the volume that DCP sells. And it pays 100 percent on the volume DCP sells and returns proceeds to it. And it pays 50 percent on the difference from what came out of Phelps as well. So Phelps has been paid this 50 percent obligation any way you look at it. It doesn't matter if these are proceeds that DCP retained or volumes that DCP retained, properly or improperly. So as two different district judges found, there's no genuine dispute of material fact that Noble complied with a 50 percent obligation in the Holman settlement as well. If the court has no further questions, we'll stand on our briefs and ask the court to affirm and put an end to this decade-old lawsuit. Thank you. Thank you, counsel. Thank you for your arguments this morning. The case will be submitted and counsel are excused. The court will be in recess for about 10 minutes.